**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JOHN GOCI,

Plaintiff

Case No.

vs.

Hon.

CITY OF DETROIT, a municipal
Corporation,

Defendant.

________________________________________/

Michael J. Steinberg (P43085)
Dana L. Craig*
Thomas A. Lichtenberg*
Civil Rights Litigation Initiative
University of Michigan Law School
701 S. State St., Suite 2020
Ann Arbor, MI 48109
(734) 763-1983
mjsteinb@umich.edu
danacrai@umich.edu
talicht@umich.edu

* Student Attorney practicing pursuant to Local
Rule 83.21

_________________________________________/

# **VERIFIED COMPLAINT FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, PERMANENT INJUNCTION, AND OTHER RELIEF**

## INTRODUCTION

1. Political speech lies at the very heart of the First Amendment. In a country built on democratic principles, it is imperative that all community members are free to participate in elections by campaigning, encouraging others to vote, and putting up a sign in support of their candidate of choice.
2. Defendant, the City of Detroit ("the City"), has unconstitutionally implemented its sign ordinance to prevent Plaintiff John Goci, and anyone other Detroit business owner, from putting up a small sign in support of a candidate without going through a long, expensive, and burdensome permit process.
3. Mr. Goci, a write-in candidate for the MI-13 Congressional Race, wants to put up a sign supporting his campaign in front of his businesses and in front of several other businesses whose owners have requested signs.
4. In future elections, he also wants to put up signs in front of his business more than 30 days before the election, but the City has made it punishable by a $600 to $3,000 fine per sign to do so.
5. Mr. Goci brings this case under the First Amendment and 42 U.S.C. § 1983 to challenge the City's implementation of its sign ordinance. Specifically, he seeks a temporary restraining order, a preliminary injunction, and a permanent injunction striking down the lengthy, expensive and burdensome

permit process required to simply display a small election sign in front of his business.

6. He also seeks a permanent injunction striking down the prohibition on placing a sign more than 30 days before an election.

**JURISDICTION AND VENUE**

7. Plaintiff brings this case under 42 U.S.C. § 1983 and the First Amendment to the United States Constitution. This Court has subject matter jurisdiction and is authorized to grant relief Plaintiff relief pursuant to 28 U.S.C. §§ 1331 and 1343.

8. Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b) because it is the judicial district where Plaintiff and Defendant are located or reside, and it is where the majority of events and omissions giving rise to this action occurred.

**PARTIES**

9. Plaintiff John Goci is an adult resident of Northville, Michigan.

10. Defendant City of Detroit is a municipal corporation in Wayne County, Michigan.

## STATEMENT OF FACTS

### Mr. Goci's Primary Campaign Features Political Signs

11. Plaintiff John Goci is currently a write-in candidate for the MI-13 Congressional race.

12. He began campaigning before primary elections in the Spring of 2026.

13. As part of that campaign, Mr. Goci created political signs that could be placed in yards or in front of businesses owned by his friends and supporters.

14. The signs are pictured here:




15. Each sign read, "John Goci, Write-In Candidate for U.S Congress, Democratic Primary 13th District. Write in 'John Goci.'"

16. Each sign had approximate dimensions of 18 inches by 22 inches.

17. Like any yard sign, Mr. Goci placed the yard sign into the dirt on patches of grass through wires attached to the sign.

18. Putting up the yard signs did not require any specialized construction knowledge or tools.

19. In the beginning of July, Mr. Goci put up roughly forty of these campaign signs in front of businesses in downtown Detroit along 8 Mile Road and Gratiot Avenue. Mr. Goci had the permission and support of the business owners, many of whom were his friends.

20. These signs were placed in the grass and outside of the public right-of-way.

21. The following are example images of some of these sign placements:

   a. Mr. Goci put a sign at Motor City Coney Island, located at 10993 Gratiot Avenue, near the "Drive Thru" lane.



b. Mr. Goci put a sign at the Hollywood Coney Island, located at 9951 Gratiot Avenue, next to a nearby lamppost.




c. Mr. Goci put a sign up at V's Drive Thru, located at 3755 East Eight Mile Road.




22. In addition to the above examples, Mr. Goci put signs in front of various restaurants and gas stations with the permission of the owners.

23. Mr. Goci also put several signs in front of businesses that he owned and was managing, with the approval of the property owners.

**The City of Detroit Told Mr. Goci to Remove His Signs**

24. A few days after placing his signs, Mr. Goci received an email from the City stating that his signs violated the Detroit City Code Chapter 4 ("the Ordinance").

25. The email included an attached flyer titled "Campaign & Advertising Yard Signs." ("the Guidance") (Exh. A.) This flyer provided guidance on how campaign signs are interpreted under the Ordinance.

26. The Guidance states that "Campaign signs . . . are not allowed on commercial property without a permit." (*Id.*)

27. The Guidance also states, "Campaign signs are permissible only during the period 30 days prior and seven days after the date of any federal, state, or local primary election." (*Id.*)

28. The Guidance warns that the "first offense" of posting a political campaign sign outside the given time window and without a permit is $600, the second offense is $1,200, and each additional offense is $3,000. (*Id.*)

29. The Guidance can be found on the Detroitmi.gov page "Blight to Beauty Corridors" under the heading, "Campaign Yard Sign Placement." *See* https://detroitmi.gov/departments/general-services-department/blight-beauty-corridors.

30. The website includes a link to a flyer matching the attachment Mr. Goci received in his email.

31. The Ordinance and related guidance documents count each individual instance of an improperly placed sign as a violation of the ordinance. (*Id.*)

32. Given that Mr. Goci placed roughly forty campaign signs, he could have been fined over $115,000 based on the numbers listed on the Guidance for first, second, and subsequent offenses.

33. Fearing repercussions and fines, Mr. Goci took down his signs after receiving the email.

34. Since receiving the email, Mr. Goci has not put up any more signs even though he wants to increase his name recognition as a component of his write-in campaign.

35. If the City's permitting scheme did not exist, Mr. Goci would replace these political signs.

36. Mr. Goci will run for office in future years. If the challenged parts of the Ordinance and the Guidance are enjoined, he will post political signs in front of consenting businesses for himself and other candidates in future elections.

37. If the challenged parts of the Ordinance and the Guidance are enjoined, he will post political signs in front of business more than 30 days before the election.

**Mr. Goci Researched the High Cost and Time Involved in Obtaining a Permit**

38. Since taking down his campaign signs, Mr. Goci has attempted to obtain a permit to better understand the costs of the process.

39. He followed steps suggested by the Guidance that the City sent him and by the City's publicly available "Temporary Signs Userguide" ("the Userguide"). (Exh. B.).

40. The Guidance that the City sent Mr. Goci instructed that he would first need to hire a licensed sign erector.

41. Mr. Goci found a list of Detroit's approved sign erectors on the City's website at https://detroitmi.gov/sites/detroitmi.localhost/files/2025-08/Sign%20Contractor%20List%202025.xls_0.pdf.

42. Mr. Goci called one of the listed sign erectors who confirmed that Mr. Goci was not able to fill out a permit application by himself. A sign erector with access to the application portal would have to fill each out application and submit them on Mr. Goci's behalf.

43. Mr. Goci was quoted $300 by the sign erector to fill out a permit application for a single sign.

44. The Ordinance and its guidance documents clarify that a permit is required for every political sign someone wants to post. (*See* Exh. A)

45. When Mr. Goci asked why the sign erector quoted so much just to fill out a permit, he was told the cost was based on the complexity of the permit application.

46. The Ordinance lays out the information required for a permit application. (Exh. C, Detroit City Code § 4-4-19).

47. The permit application includes over forty fields for different information.

48. For example, the sign erector must provide a site plan showing the existing conditions of the premises, including: "(a) North arrow, legend, if applicable, with graphic and written scale; (b) Location map showing the location of the premises; (c) Locations and names of all public rights-of-way, private roads, and railroads, as well as all existing pedestrian pathways and driveways, whether adjacent or interior to the premises; (d) Locations and outer perimeter dimensions of all existing buildings and other structures on the premises; (e) Locations of all existing signs; and (f) Location of proposed sign." (*Id.*)

49. A distinct map of this type would be required for each one of Mr. Goci's forty signs, in addition to all of the other information requested in the application.

50. Mr. Goci was also told that the cost of filling out the permit application included work that the sign erector might be asked to do by the City, such as

taking pictures of the site where the sign will be placed. The sign erector cannot anticipate these requests in advance.

51. In addition to the cost of hiring a sign erector, the Ordinance requires a fee paid to the City to submit each permit. It does not list an amount, and neither do the related guidance documents about political signs. (Exh. C, Detroit City Code § 4-4-18).

52. Mr. Goci attempted to call the City to determine this cost.

53. The Guidance listed the number for the Property and Maintenance Division of the Buildings, Safety, Engineering, and Environmental Department ("BSEED"), but the person who answered the phone told Mr. Goci they did not know the amount of a permit application fee. The person told Mr. Goci that the Property and Maintenance Division only enforces ordinance violations.

54. The person at the Property and Maintenance told Mr. Goci to call another division in BSEED. That division also told him that they did not know the amount of a permit application fee.

55. Even if Mr. Goci had been able to discover this cost and could afford to purchase permit applications for his campaign signs, neither the Ordinance nor the Guidance states how long it takes for the City to approve or deny an application.

56. The Userguide includes a flow chart explaining the many steps that each permit must take to have a sign approved. That flowchart is pictured here:



57. Based on this chart, the permit application, approval, and sign installation process involves between twelve and twenty distinct steps.

58. Even when a permit is approved, the Ordinance and its related guidance documents also require that a licensed sign erector install the sign.

59. There are no listed exceptions for installing simple wire signs like Mr. Goci's, which he was able to place in the ground by himself in mere seconds. He must pay someone else to install the signs for him.

60. Mr. Goci was not able to determine how much it would cost for the sign erector to install the signs if the permit was approved, but he knows that would be a separate charge.

61. Mr. Goci does not have the money for forty sign permits or the time to wait an indeterminate amount of time for each to be approved.

62. Under the First Amendment, Mr. Goci is entitled to engage in political free speech without undue cost or time barriers.

## The Challenged Ordinance Fines Political Speech at a Higher Rate Than Commercial Speech and Exempts Several Types of Non-Political Speech From the Permitting Scheme Altogether

63. The Guidance sent to Mr. Goci (Exh. A) states that "political campaign signs are temporary advertising signs" which are regulated by the Ordinance. (Exh. C).

64. Because it is an official document promulgated by the City, the Guidance represents the City's interpretation of the Ordinance for enforcement purposes.

65. Under the Ordinance and Guidance, political speech is subject to more stringent permit requirements and higher fine schemes than many types of non-political speech.

66. For example, the Ordinance exempts many types of non-political speech from its permitting scheme altogether. Business owners do not have to obtain a permit to place the following types of messages on their property:

   a. "For sale" or "for lease" signs. (Exh. C Section 4-4-183(a)(1)).
   b. "Public service announcements promoting the protection of the public peace, health, safety, and welfare." (Exh. C, Section 4-4-8).
   c. "Displays of the flags, emblems, or official insignia of a national, state, or local political unit or any of its departments or agencies," "art murals," and "heritage signs." (*Id.*)
   d. There are exemptions for "for sale" or "for lease" signs. (Exh. C Section 4-4-183(a)(1)).

67. Additionally, business signs and advertising signs are subject to two different fine schemes under the Ordinance. Advertising signs—which

according to the Guidance, includes political signs—are fined at a higher rate. (*See* Exh. C, Section 4-4-2(d)(1)-(2)).

68. In order to for Detroit officials to know which fine scheme to apply when identifying a sign violation, they must read the sign's message to determine whether it is a political sign or a business sign. If it is a political sign, it is fined at a higher rate than non-political, commercial speech. (*See* Exh. A).

## CAUSES OF ACTION

### COUNT I

### The City's Requirement that Business Owner's Obtain a Permit to Post Political Signs is Unconstitutional on Its Face and As Applied Because It is Content Based, Not Narrowly Drawn to Advance a Compelling or Significant Government Interest, and Does not Leave Open Adequate Alternative Means of Communication.

**First Amendment and 42 U.S.C. § 1983**

69. The First Amendment to the United States Constitution prohibits abridgement of the freedom of speech. The First Amendment is incorporated against the States by the Fourteenth Amendment. Persons violating the First Amendment under color of state or local law are liable at law and in equity under 42 U.S.C. § 1983.

70. Political speech is core protected speech under the First Amendment.

71. Time, place, and manner restrictions on political speech can survive constitutional scrutiny if they are content-neutral, narrowly drawn to

advance a compelling or significant interest, and leave open ample alternative means of communication. The City's sign ordinance meets none of these requirements.

<u>The Ordinance and Guidance are Facially Content-Based</u>

72. The City of Detroit's Code is facially content-based.

73. First, permit requirements are applied based on the content of a message. The City must demine whether a message is political in order to decide that it requires a permit. Political signs are also subject to higher fines than other types of signs if they violate the permit requirement.

74. Second, the Ordinance exempts many types of non-political speech from permitting altogether, including "for sale" signs, service signs, murals, and official government insignia. (See Exh. C Section 4-4-8; Section 4-4-183(a)).

75. Third, the Ordinance subjects political signs to stringent time limits by creating a category of "portable" temporary signs that are allowed only during the thirty days prior to a primary and seven days after a general election. (Exh. C Section 4-4-183(3)).

76. Because the sign regulations are content-based, they are required to survive strict scrutiny.

The Ordinance and Guidance Are Not Narrowly Draw to Advance Either a Compelling or Significant Government Interest

77. The City claims that its sign ordinance serves public safety, welfare, and aesthetic goals while also facilitating public speech, reducing conflict, and promoting local commerce. (Exh. C, Detroit City Code § Section 4-4-1(b)).

78. However, the fact that the City allows business to post real estate signs, public service announcements, flags and murals without first obtaining a permit demonstrates that the permit requirement for political signs is not narrowly tailored to advancing these interests.

79. The permitting structure for political signs is so complex, expensive, and time-consuming that it is not narrowly tailored to any of the City's goals, especially in regards to core political speech.

80. Restricting political signs to 30 days before an election also does not serve any of these goals, especially because other signs and messages can be displayed without durational limits. Instead, it undercuts the effectiveness of campaign signs by preventing candidates from reaching the electorate before mail-in voting begins.

The Ordinance Do Not Leave Open Ample Alternative Means of Communication

81. Political signs in front of businesses accomplish goals that other types of speech cannot.

82. The Supreme Court recognizes that political signs are inexpensive, take little time to place, and reach audiences not otherwise easily reachable via other means. For those reasons, signs are considered a valuable and unique form of political speech.

83. Subjecting political signs to an expensive and complex permit scheme leaves Plaintiff and other Detroit business owners without similarly effective and adequate ways to support their chosen candidates.

## COUNT III

### The City of Detroit's Ordinances Create an Unconstitutional Prior Restraint for Protected Political Speech.

### First Amendment and 42 U.S.C. § 1983

84. The First Amendment to the United States Constitution carries a strong presumption against prior restraints.

85. The permitting scheme in the Ordinance is a prior restraint that requires Plaintiff and other Detroit residents to secure the government's permission before they engage in political speech.

86. As an even greater burden, Detroit residents must pay a significant amount of money and wait an unspecified amount of time to be granted permits by the City.

87. Political speech is core to the First Amendment. The strong presumption against prior restraints is even stronger for political speech.

88. The City's permit scheme is an unconstitutional prior restraint because it is content-based and grants exceptions to other types of non-political speech.

89. The City's permit scheme also does not provide sufficient procedural safeguards to protect against unbridled discretion in enforcing the ordinance. The Ordinance does not specify how much time the City has to approval or deny permit applications.

90. Even if the permit scheme is found content-neutral, it is not narrowly tailored to a significant government interest.

91. Political speech is so central to our democracy that a permitting scheme this complex and expensive goes far beyond maintaining any City interest in aesthetics, safety, or welfare.

**RELIEF REQUESTED**

92. WHREFORE, Plaintiff respectfully requests that this Court:

A. Enter a judgment declaring that Defendant violated Plaintiff's First Amendment right to free speech.

B. Issue a temporary, preliminary, and permanent injunction enjoining Defendant and from preventing Plaintiff from posting his signs without a permit before the November 2026 Election and all future elections.

C. Enter a judgement declaring that the Ordinance and Guidance's permit requirement for political sign and their ban on displaying political yard signs more than 30 days before an election are both facially unconstitutional and unconstitutional as applied to Plaintiff's political speech.

D. Award damages or nominal damages to Plaintiff,

E. Award costs and attorneys' fees pursuant to 42 U.S.C § 1988; and

F. Grant such other and additional relief that the Court finds just and appropriate under the circumstances.

Respectfully submitted,

/s/Michael J. Steinberg
Michael J. Steinberg (P43085)
Dana L. Craig*
Thomas A. Lichtenberg*
Civil Rights Litigation Initiative
University of Michigan Law School
701 S. State St., Suite 2020
Ann Arbor, MI 48109
(734) 763-1983
mjsteinb@umich.edu
danacrai@umich.edu
talicht@umich.edu

*Counsel for Plaintiff*

* Student Attorney practicing pursuant to
Local Rule 83.21

Dated: October 21, 2026

## VERIFICATION

I declare under the penalty of perjury, pursuant to 28 U.S.C § 1746, that the above factual statements set forth in this Verified Petition are true to the best of my knowledge, information, and belief.

John Goci 10/22/2026